**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Leonel REYNA, Defendant-Appellant.**

No. 76–1898.

United States Court of Appeals, Fifth Circuit.

May 5, 1978.

Rehearing and Rehearing En Banc Denied June 6, 1978.

Ramon Garcia, Edinburg, Tex., for defendant-appellant.

J. A. Canales, U. S. Atty., Mary L. Sinderson, George A. Kelt, Jr., Asst. U. S. Attys., Houston, Tex., Robert A. Berg, Asst. U. S. Atty., Corpus Christi, Tex., for plaintiff-appellee.

Before GOLDBERG and MORGAN, Circuit Judges, and WYZANSKI, District Judge.*

LEWIS R. MORGAN, Circuit Judge:

In *United States v. Reyna,* 563 F.2d 1169 (1977), we retained jurisdiction of the appeal pending determination by the district court of the status of the Sarita checkpoint as a functional equivalent of the border. Because the conviction of appellant was based wholly on evidence obtained during a search at the checkpoint, that determination would be dispositive of appellant's ap-

* Senior District Judge for the District of Massachusetts, sitting by designation.

peal. Because the district court determined that the Sarita checkpoint is the functional equivalent of the border, and we do not disturb that finding, we are now prepared to affirm.

In our first opinion we outlined the factors necessary to a determination of functional equivalence. Following *United States v. Alvarez-Gonzalez*, 542 F.2d 226 (5th Cir. 1976), we directed the district court to consider three major factors to determine functional equivalence: relative permanence of the checkpoint; minimal interdiction by the checkpoint of the flow of domestic traffic; and the practical necessity of the substitution of the interior checkpoint for the border in order to monitor international traffic. In addition, we required that the determination of functional equivalence relate to the time of arrest. Armed with results of the district court's hearing, we may now determine functional equivalence.

 The major factor necessary to an affirmative determination of functional equivalence is the minimal interdiction of domestic traffic. *See United States v. Bowen*, 500 F.2d 960, 965 (9th Cir. 1974), *aff'd* 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 (1975). Because minimal is somewhat qualitative, it has been indicated that should the percentage of domestic travel approach the majority, the checkpoint would not be the functional equivalent of the border. *United States v. Alvarez-Gonzalez*, 542 F.2d at 226. In the second *Alvarez-Gonzalez* case, 561 F.2d 620, 623 (5th Cir. 1977), the court determined that approximately 60% international traffic satisfied the test. In the instant case, a 1977 survey conducted by the Patrol, reported that approximately 68% of the vehicles were considered non-domestic travel. Additionally, the chief border patrol agent for the area testified that the conditions were substantially unchanged since 1972 and, therefore, would conclude that the percentage in 1972 would vary by only one or two percent. It is necessary to note that in determining whether traffic was of international origin, the district court adopted the definition formulated in *Alvarez-Gonzalez*, 561 F.2d at 625. In *Alvarez-Gonzalez*, the court included in the "international" category, those who had begun their journey in the immediate border area. In the instant case, the "immediate border area" was defined as the area south of U.S. 281 running parallel to the border. Thus, the international traffic measured includes not only those trips begun across the border, but also those whose origin was on the Texas shore of the Rio Grande. We feel ourselves bound by *Alvarez-Gonzalez* in this definition of the international traffic, despite Judge Goldberg's eloquent and reasoned invitation to limit *Alvarez-Gonzalez* to the facts. Therefore, we accept the district court's finding that 68% interdiction rate exists at the Sarita checkpoint and we hold that the first criteria for functional equivalence is satisfied.

 In addition to minimally interfering with domestic travel, a checkpoint must be permanent in order to be the functional equivalent of the border. In 1972, there were two "permanent" locations between which the Sarita checkpoint alternated. The purpose for this alternation was to confuse illegal aliens and alien smugglers. Both of these locations were well north of the last side road leading from the border. Even though the checkpoint alternated between two cities on Highway 77, such alternation does not reduce the checkpoint to the status of a roving border patrol condemned in *United States v. Almeida-Sanchez*, 413 U.S. 266, 273, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). We therefore hold that the permanence criteria is satisfied.

 The third and final consideration is the extent to which the checkpoint is the necessary practical substitute of the border. This criteria reflects the tactical necessity for an interior checkpoint because of a practical inability to police the border. Germane to this criteria is the extent to which the access of the border is uncontrolled, the necessity of the checkpoint to monitor the uncontrolled access, and the degree of success the checkpoint has enjoyed. *United States v. Hart*, 506 F.2d 887 (5 Cir.) *vacated and remanded*, 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706 *reaff'd* 525 F.2d 1199 (5th Cir. 1976) (on remand). In the instant case, south of the Sarita checkpoint, Highway 77

is joined by several highways that intersect with Highways 83 and 281. Highway 281 parallels the Rio Grande along the entire Rio Grande Valley. Leading from the river bed to Highway 281 are numerous dirt roads and paths impossible to patrol. Therefore, the access to the border is uncontrolled. Additionally, the Sarita checkpoint is tactically necessary as reflected by the density of the Mexican population directly opposite the sector, and great number of those who have 25 mile passes. Finally, the Sarita checkpoint has enjoyed considerable success in detecting illegal aliens. In 1977, 1,926 aliens were arrested at the Sarita checkpoint; in 1972, 1,679. The number of aliens apprehended reflects the necessity for scrutiny because it implies that this traffic was not previously scrutinized. It is evident that the Sarita checkpoint is a necessary substitute for the border, and in terms of success, scrutinizes international traffic not checked prior to Sarita.

Because the three conditions for the existence of functional equivalence were satisfied as of 1972, the Sarita installation is a functional equivalent of the border and we therefore

AFFIRM.